**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAMARA FONG, *as the Administratrix and Administratrix Ad Prosequendum of the ESTATE OF CARL DORSEY III, and Guardian Ad Litem to Minor Children G.O.D., J.D.D., and J.H.D.*, | Civil Action No. 22-7243 (SDW)(MAH) **OPINION** December 28, 2023 |

Plaintiff,

v.

CITY OF NEWARK, et al.,

Defendants.

**WIGENTON**, District Judge.

Before this Court are Defendants City of Newark (the "City"), Detective Rod Simpkins, Chief of Police Darnell Henry, Chief of Police Lee Douglas III, Anthony F. Ambrose, Brian F. O'Hara, Ronald Slaughter, Raul Malave, Sharonda Morris, Arthur Jorge, Tawana Rollins, and Deidre Gully's (collectively, "Defendants")[1] Motions to Dismiss[2] (D.E. 43–47 ("Motions")) Plaintiff Tamara Fong's[3] ("Plaintiff") Complaint (D.E. 1) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and § 1367(a).

---

[1] Defendants Henry, Douglas, Ambrose, O'Hara, Slaughter, Malave, Morris, Jorge, Rollins, and Gully are collectively referred to as "Supervisory Defendants" hereinafter.  The Complaint names both Henry and Douglas as Chief of Police for the Newark Police Department ("NPD") "at relevant times" (D.E. 1 ¶¶ 14, 16), but provides no explanation as to how Henry and Douglass could both be the NPD police chief on January 1, 2021, when the incident upon which this action arose occurred.

[2] Plaintiff has also named Officers John Doe 1–5 of the NPD as defendants.  Although courts may "allow claims based upon 'fictitious' defendants because they may be found and named later through the discovery process," *K.J. ex rel. Lowry v. Div. of Youth & Fam. Servs.*, 363 F. Supp. 2d 728, 740 (D.N.J. 2005) (citing *Alston v. Parker*, 363 F.3d 229, 233 n.6 (3d Cir. 2004)), where Plaintiff has failed to plead facts sufficient to sustain a claim against any defendant, claims against fictitious defendants will be dismissed as well.

[3] Plaintiff Tamara Fong is also mother to three of Dorsey's children.

Venue is proper pursuant to 28 U.S.C. § 1391.  This opinion is issued without oral argument pursuant to Rule 78 and Local Civil Rule 78.1.  For the reasons stated herein, the Motions are **GRANTED in part and DENIED in part**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Carl Dorsey's Death on January 1, 2021

On January 1, 2021, just after midnight, Defendant Detective Simpkins of the NPD shot and killed Carl Dorsey III, a 39-year-old Black man, when he and Officers Doe 1-4 were responding to reports of gun shots at the intersection of Woodland Avenue and South Eleventh Street in Newark, New Jersey.  (D.E. 1 ¶¶ 36–38.)  The officers were in plain clothes and traveling in two unmarked police vehicles on South Eleventh Street.  (*Id*. ¶ 39.)  Surveillance video footage from a nearby residence ("Video"), released to the public by the Office of the Attorney General, captured the incident.[4]  (*Id*. ¶ 40.)

The first police car, driven by Officer Doe 1 with Officer Doe 2 in the front passenger seat and Detective Simpkins in the rear passenger seat stopped in front of Dorsey as he was crossing South Eleventh Street.  (*Id*. ¶¶ 40–41.)  At the same time, Simpkins quickly exited from the rear passenger door, leaving the door open, with his service weapon drawn.  (*Id*. ¶¶ 42–44.)

Simpkins ran towards Dorsey with his gun drawn, blocking Dorsey as Dorsey tried to run past him.  (*Id*. ¶ 45.)  The two men collided and spun around facing each other.  (*Id*. ¶¶ 46–47.)  Dorsey was backing away from Simpkins with his hands raised and open.  (*Id*. ¶ 47.)  At this time, Simpkins fired his gun at Dorsey and hit him in the torso while falling backwards to the ground.  (*Id*. ¶ 48.)  Dorsey immediately fell between two vehicles parked on the street.  (*Id*. ¶¶ 51–52.)  Dorsey was not carrying or brandishing any weapon.  (*Id*. ¶ 72.)  The time that elapsed between

---

[4] The officers and the police vehicles were not equipped with functioning body or dash cameras.  (*Id.* ¶ 39.)

the first police vehicle arriving and Simpkins fatally shooting Dorsey was about four to five seconds. (*Id*. ¶ 50.)

Simpkins got up from the ground, walked onto the sidewalk, stood over Dorsey, and then bent down and searched Dorsey for approximately six seconds. (*Id*. ¶¶ 53–55.) About eighty seconds after shooting Dorsey, Simpkins searched Dorsey a second time as Officers Doe 1-4 shined their flashlights down onto the ground around Dorsey's body. (*Id*. ¶ 56.) The police did not recover any firearm from Dorsey or his immediate area. (*Id*. ¶ 73.) Plaintiff alleges at no time did Simpkins identify himself as a police officer, have probable cause or reasonable suspicion to stop, seize, or search Dorsey, have a justifiable reason to discharge his weapon at Dorsey, or attempt to administer medical aid to Dorsey after he was shot. (*Id*. ¶¶ 57–60.)

While Simpkins confronted and fatally shot Dorsey, Officers Doe 1-3 remained inside of their vehicles. (*Id*. ¶ 61.) After Dorsey was shot, Officers Doe 1-3 left the immediate area leaving Simpkins to search Dorsey and then returned to use their flashlights to assist Simpkins in his second search of Dorsey. (*Id*. ¶¶ 62–64.) Officer Doe 4 arrived on the scene about forty seconds after Dorsey was shot and assisted Simpkins in his second search of Dorsey. (*Id*. ¶¶ 66–67.) The Doe officers did not intervene in Simpkins' use of deadly force on Dorsey or provide any medical aid to Dorsey. (*Id*. ¶¶ 65, 68–69.)

It is not clear on this record how long Dorsey waited to receive medical care. Dorsey was ultimately transported to University Hospital in Newark where he was pronounced dead at 1:37 AM. (*Id*. ¶ 71.)

### B. Procedural History

On December 13, 2022, Plaintiff filed the instant suit against Defendants, asserting constitutional claims under 42 U.S.C. §1983 and the New Jersey Civil Rights Act ("NJCRA"),

statutory claims under the Omnibus Crime Control and Safe Streets Act of 1968 ("Safe Streets Act"), 42 U.S.C. § 3789d(c), and Title VI of the Civil Rights Act ("Title VI"), 42 U.S.C. § 1988, and common law tort claims under the New Jersey Tort Claims Act ("NJTCA").  All Defendants moved to dismiss the Complaint in May 2023 under Rule 12(b)(6) and the parties timely completed briefing.  (*See* D.E. 43–47, 55–59, 62–63, 70–72.)

## II.    LEGAL STANDARD

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) ("[I]n light of *Twombly*, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief").

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips*, 515 F.3d at 231 (citation omitted).  A court, however, need not accept as true allegations that are "recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  (citation omitted)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) (discussing the *Iqbal* standard).

Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*,

4

556 U.S. at 679.  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2).  *Id.*  Moreover, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).

## III.   **DISCUSSION**

The Complaint contains nineteen counts, asserting common law tort claims[5] under the NJTCA, constitutional claims under § 1983 and the NJCRA for violations of Dorsey's rights pursuant to the United States and New Jersey Constitutions, and claims for racial discrimination under the Safe Streets Act and Title VI.

To state a claim under § 1983, a plaintiff must allege facts showing that (1) he was deprived of "rights, privileges, or immunities" afforded him under the United States Constitution or other federal law, and (2) "the conduct complained of was committed by a person acting under color of state law."  *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011); *see* 42 U.S.C. § 1983.[6]  Section 1983 does not create any substantive rights; it merely provides a means to redress violations of federal law committed by state actors.  *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

---

[5] Plaintiff's tort claims are: assault, battery, intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), negligent hiring, negligent retention and supervision, wrongful death, and survival action.  (*See* D.E. 1 ¶¶ 221–75.)

[6] Section 1983 provides in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

Civil claims for deprivation of or interference with a person's rights guaranteed by the laws and Constitutions of New Jersey and the United States can be asserted by way of the NJCRA.  N.J. Stat. Ann. 10:6-1 *et seq.*; *see Gormley v. Wood-El*, 93 A.3d 344, 358 (N.J. 2014) ("Section 1983 applies only to deprivations of federal rights, whereas [the NJCRA] applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws.").  Because the NJCRA is interpreted analogously to § 1983, this Court's § 1983 analysis controls Plaintiff's NJCRA claims (Count XI) as well.[7]  *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (noting that the NJCRA "was modeled after 42 U.S.C. § 1983"); *Perez v. Zagami, LLC*, 94 A.3d 869, 875 (N.J. 2014) (stating that the NJCRA is "a state law analogue to Section 1983") (footnote omitted).

The NJTCA provides for limited circumstances under which a plaintiff may bring a tort claim against public entities and employees.  *See* N.J. Stat. Ann. 59:1-1 *et seq.*; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (stating that sovereign immunity bars suits against a State or its officials without its consent).  Generally, "[e]xcept as otherwise provided by [the NJTCA], a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."  N.J. Stat. Ann. 59:2-1(a).  Under one such exception, "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment . . . ."  N.J. Stat. Ann. 59:2-

---

[7] The NJCRA provides that

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann. 10:6-2(c).

2(a).  A public employee, however, is not liable for "acts in good faith in the execution or enforcement of any law."  N.J. Stat. Ann. 59:3-3.

Defendants move to dismiss the Complaint under Rule 12(b)(6) on the grounds that (1) Simpkins is entitled to qualified immunity, (2) the Complaint fails to show that Plaintiff has met the notice requirement under the NJTCA, and (3) that Plaintiff has failed to state a claim against the City and the Supervisory Defendants upon which relief can be granted.  This Court will address each of Plaintiff's claims in turn.

### A.  Qualified Immunity (Counts I to III and VII)

Simpkins argues that the Complaint must be dismissed with prejudice based on qualified immunity.  Qualified immunity does not shield Simpkins at this stage, however, because on this record, this Court cannot conclude that Simpkins' actions were objectively reasonable.

"The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether qualified immunity applies, courts must engage in a two-part inquiry:  First, do the allegations in the complaint show that defendant's conduct violated a constitutional right; second, was the constitutional right clearly established at the time of the alleged violation.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 236 (no longer requiring courts to determine *Saucier* prongs in sequential order).[8]

---

[8] Qualified immunity under the NJCRA "tracks the federal standard."  *Brown v. State*, 165 A.3d. 735, 743 (N.J. 2017) (holding the application of qualified immunity requires a two-step inquiry:  (1) whether "the facts, taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right"; and (2) whether "that constitutional right was clearly established at the time that defendant acted").

"[Q]ualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006).[9]  "[T]he burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff." *Id.* at 293.  This Court will analyze Simpkins' entitlement to qualified immunity under this standard for each of Plaintiff's constitutional claims.[10]

  i. *Excessive force and unreasonable seizure (Counts I and II)*[11]

Simpkins seeks qualified immunity against Plaintiff's excessive force and illegal seizure claims.  At this stage, however, Simpkins is not entitled to qualified immunity as he has not shown his use of deadly force on Dorsey was objectively reasonable.

Courts in the Third Circuit have applied the objective reasonableness standard to excessive force and unreasonable seizure claims when determining whether qualified immunity should apply.  *See e.g.*, *Santini*, 795 F.3d at 417 ("In an excessive force case, we determine whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test.") (citations omitted); *Tofano v. Reidel*, 61 F. Supp. 2d 289, 299 (D.N.J. 1999) (applying the reasonableness standard to both excessive force and unreasonable seizure claims); *Doss v. Osty*, No. 10-3497, 2011 WL 2559558, at *4 (D.N.J. June 27, 2011) (same).  The objective

---

[9] Although qualified immunity issues should be resolved at "the earliest possible stage in litigation," *see Independence Twp.*, 463 F.3d at 291 (citing *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)), the Third Circuit has cautioned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009).

[10] This Court is guided in part by the Video of the incident.  In cases where relevant events are captured on video, courts should analyze the facts as they are depicted in the video over the parties' characterizations of said events.  *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

[11] While both parties reference Plaintiff's claim for false arrest in their briefs, this Court does not find that the Complaint has explicitly pled a false arrest claim and thereby dismisses it without prejudice.

reasonableness test is a fact-sensitive inquiry into "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

Specifically, the Supreme Court has articulated three factors that must be considered in determining whether the use of force was reasonable in a given case:  (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham*, 490 U.S. at 396.  The Third Circuit expanded this inquiry in *Sharrar v. Felsing*, to include (4) "the possibility that the persons subject to the police action are themselves violent or dangerous," (5) "the duration of the action," (6) "whether the action takes place in the context of effecting an arrest," (7) "the possibility that the suspect may be armed," and (8) "the number of persons with whom the police officers must contend at one time."  128 F.3d 810, 822 (3d Cir. 1997).  Moreover, this Court must analyze the objective reasonableness of the officers' behavior "from the perspective of the officer[s] at the time of the incident and not with the benefit of hindsight." *Santini*, 795 F.3d at 417.

The Complaint's allegations, taken as true as we must on a motion to dismiss, sufficiently state an excessive force claim.  "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citation omitted)).  Dorsey was obviously seized when Simpkins shot him. *See Garner*, 471 U.S. at 7 ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").  The question here is whether Simpkins' use of deadly force was reasonable.

Deadly force will only be considered reasonable when "it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3. Probable cause means "facts and circumstances sufficient to warrant a prudent man into believing that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1995) (citation and internal quotation marks omitted).

The Complaint alleges that: Simpkins and other officers were in plainclothes and in two unmarked police vehicles responding to reports of gun shots near where they encountered Dorsey, who was crossing the street; when the first police vehicle stopped, Simpkins quickly exited from its the rear passenger door, with his gun drawn, and charged towards Dorsey, who was running in front of the first police vehicle; Simpkins collided with Dorsey, causing both men to spin round; and Simpkins shot Dorsey immediately after the collision as Dorsey was moving backwards away from Simpkins with his hands in the air. (D.E. 1 ¶¶ 36–60.)

Applying the *Graham* and *Sharrar* factors to the facts alleged in the Complaint, this Court cannot conclude Simpkins' use of deadly force was reasonable under the totality of the circumstances. *Cf. Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011) (holding that an officer's use of deadly force was reasonable when undisputed evidence shows that the suspect refused to comply with officer's command that he show his hands and pulled his right hand abruptly out of his waistband as though he were drawing a pistol). The factual allegations do not support any plausible inference that Dorsey was committing a crime, armed and/or dangerous, or resisted or attempted to evade arrest.[12]

---

[12] Simpkins concedes in his briefing that after he shot Dorsey, other officers "rushed past him toward the shootout on or about Woodland Avenue" and they apprehended an individual who pointed and discarded his gun at the scene on South Eleventh Street. (D.E. 47-5 at 16). The suspect later pled guilty to a firearm charge. (*Id.*)

Simpkins claims that he is entitled to qualified immunity for his "good faith" mistake of fact and law. The Third Circuit has made clear that "a good faith belief in the legality of conduct is not sufficient[;] [s]uch belief must be objectively reasonable." Citing two cases for support, Simpkins unsuccessfully argues that his mistaken belief that Dorsey was armed and engaged in a crime was reasonable. *See Richardson v. City of Newark*, 820 F. App'x 98, 100, 103 (3d Cir. 2020); *Conde v. City of Atl. City*, 293 F. Supp. 3d 493, 505 (D.N.J. 2017). These cases, however, are distinguishable.

In *Conde*, the court found that the defendant officer who shot and killed a suspect during pursuit had a reasonable belief that the suspect was armed because: the suspect was known to the police and was described as armed on the police radio; several officers observed the suspect possessing a handgun during the pursuit; and non-law enforcement eyewitness accounts corroborated the defendant officer's testimony that he shot the suspect after the suspect began to turn toward him and reached into his waistband.

In *Richardson*, the Third Circuit found that the defendant officer's use of deadly force was reasonable based on the following non-contested facts: Richardson had objects in his jacket's front pocket that could have formed a bulge when the defendant officer stopped him; Richardson fled immediately after the defendant officer felt the object in his jacket, and when the officer fired the shot that hit Richardson, he had just forced entry into an apartment building and attempted to forcibly pry open a different door in the building.

Here, there are no facts analogous to those in *Conde* or *Richardson* that would suggest that Dorsey was armed, committing a crime, and/or attempting to evade arrest at the time Simpkins encountered him to justify the use of deadly force. Accordingly, Plaintiff has plausibly pled a violation of Dorsey's right to be free from excessive force.

Simpkins' arguments for his entitlement to qualified immunity, in essence, are: he encountered Dorsey near the location where gun shots were reported; he and Dorsey collided when he exited the police vehicle and charged towards Dorsey with his service weapon drawn and the collision made Simpkins fear for his safety; and the encounter happened in a matter of seconds and his split-second decision to shoot Dorsey was entitled to qualified immunity.  Simpkins, however, does not sufficiently explain why he reasonably believed that Dorsey was a dangerous or armed criminal suspect.  Instead, he sets forth an alternative set of facts disputed by Plaintiff, such as, Dorsey "hit and shoved" him "to the floor," Dorsey "attacked [him] in the context of an active shootout," Dorsey was "an unknown fleeing assailant" and Dorsey "ram[med] into and pushe[d]" him.  (D.E. 47-5 at 9, 36, 37, 42).

The Third Circuit has made clear that where material factual disputes are relevant to determining whether an officer is entitled to qualified immunity, it is improper for courts to grant qualified immunity at the pleading stage.  *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury.") (citing *Johnson v. Jones*, 515 U.S. 304, 313, (1995)).  Because factual disputes relevant to the determination of qualified immunity cannot be resolved on the present record, Simpkins is not entitled to qualified immunity at this stage.

Simpkins also has not met his burden, under step two of the qualified immunity analysis, in showing that it would not have been clear to a reasonable officer that his "conduct was unlawful in the situation he confronted."  *Santini*, 795 F.3d at 417.  "[N]umerous courts have held that the right to be free from excessive force, as defined by the reasonableness test of *Graham*, is clearly established."  *Tofano*, 61 F. Supp. 2d at 299 (citing *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th

12

Cir. 1995) (stating that "[t]his court has held the reasonableness standard is 'clearly established' for purposes of section 1983 actions")).

Simpkins contends that there is no clearly established law precluding him from "using deadly force against an individual who was running from an active shooting scene, used force against the detective sufficient to knock the detective down, and was immediately spinning toward the detective as the detective was falling to the ground." (D.E. 47-5 at 32–33.) Again, Simpkins' argument rests on disputed material facts. As discussed above, the facts surrounding the encounter are limited on this record. Thus, this Court cannot find that qualified immunity exists at the pleading stage.

### ii.    *Unreasonable Search (Count III)*

Simpkins argues that it was objectively reasonable for him to perform two warrantless searches on Dorsey's person after he shot Dorsey. For the same reasons as stated above, Simpkins is not entitled to qualified immunity for his searches of Dorsey at this stage.

Simpkins has not demonstrated that Dorsey's right to be free from unlawful searches was not clearly established. The constitutional right to be free from warrantless searches has been so clearly established that a reasonable officer would have understood that "warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment." *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (citation omitted). Exigent circumstances "include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006).

Under the first step of the qualified immunity analysis, the Complaint plausibly states a violation of Dorsey's right to be free from unlawful searches. As stated above, nothing in the

record indicates probable cause or exigency to justify Simpkins' search of Dorsey.  The Complaint alleges, and the Video shows, that:  Dorsey was unarmed and not carrying anything that looked like a weapon; he was not engaging in any criminal activity or fleeing from a crime scene; he had no outstanding warrant for his arrest and was not known to the police as a criminal suspect; and he was backing away from Simpkins with his hands in the air immediately before he was shot. Therefore, there is an insufficient factual basis to conclude that Simpkins had probable cause or an exigency to search Dorsey without his consent after he was shot.

Simpkins argues that his search of Dorsey was reasonable because it was a "search incident to arrest" and that an officer is legally permitted to search a suspect for weapons for his own safety. While a search incident to a *lawful* arrest is an exception to the warrant requirement, *see Arizona v. Gant*, 556 U.S. 332, 338 (2009), this Court cannot conclude that Dorsey's arrest was lawful based on the facts in this record.  As stated above, there are disputed materials facts surrounding whether Simpkins reasonably believed that Dorsey was dangerous or fleeing from a crime scene and was justified in searching Dorsey after he was shot.  Therefore, Simpkins is not entitled to qualified immunity for Plaintiff's unreasonable search claim at this time.

### iii.    Failure to provide medical care (Count VII)

Simpkins contends that he is entitled to qualified immunity as to Plaintiff's claim for failure to render medical care to Dorsey.  For the same reasons as stated above, Simpkins has not met his burden of showing that his conduct was reasonable and that Dorsey's right to medical care was not clearly established.  Therefore, he is not entitled to qualified immunity at this time.

The police's "failure to provide medical care to a person in custody can rise to the level of a constitutional violation."  *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995).  To plead a violation of the right to medical care, an individual must allege "a serious medical need"

and "acts or omissions by [officers] that indicate a deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citation omitted).   A serious medical need is "one that is so obvious that a layperson would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347–48 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979).   Deliberate indifference is a subjective standard consistent with recklessness.   *Natale*, 318 F.3d at 582.   It requires both that an officer be aware of facts from which the inference could be drawn of a substantial risk and that the officer draws that inference.   *See id.*

The parties do not dispute that Dorsey had a "serious medical need."   They disagree on whether Simpkins' conduct amounts to deliberate indifference.   The Complaint alleges, and the Video shows, that Simpkins did not render any medical aid after shooting Dorsey in the torso at close range and even after he searched Dorsey twice.   Simpkins argues that his decision to search Dorsey twice and delay medical assistance was reasonable because Dorsey was "fleeing from an active shooting scene, and assaulting Detective Simpkins to get away."   Again, Simpkins' argument for qualified immunity centers on contested material facts.   Where there is a factual dispute material to the issue of deliberate indifference, a court cannot grant an officer qualified immunity.   *See Beers–Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) ("Because there is a genuine issue of fact as to whether [defendant] was deliberately indifferent, she has not carried her burden to establish that she is entitled to such immunity.").

Simpkins' contention that there is "no clearly established law" to put him on notice that his delaying of medical treatment for Dorsey would violate Dorsey's rights is equally unpersuasive. In inadequate medical care cases, the Third Circuit has found deliberate indifference where objective evidence of a serious need for care is ignored and where "necessary medical treatment

15

is delayed for non-medical reasons." *Natale*, 318 F.3d at 582 (quoting *Lanzaro*, 834 F.2d at 347). Therefore, Simpkins is not entitled to dismiss Plaintiff's claim for failure to provide medical care on qualified immunity grounds at this time.

### B.  Common Law Tort Claims (Counts XII to XIX)

Defendants argue that Plaintiff's common law tort claims must be dismissed for non-compliance with the NJTCA's notice requirement and for failure to sufficiently state a claim. Because the Complaint does not adequately plead that the notice of tort claim was timely filed pursuant to the NJTCA, Plaintiff's tort claims will be dismissed without prejudice.

The NJTCA requires a claimant to file a notice of tort claim with the entity being sued within ninety days of the tort claim's accrual.  N.J. Stat. Ann. § 59:8-8; *see Tripo v. Robert Wood Johnson Med. Ctr.*, 845 F. Supp. 2d 621, 626 (D.N.J. 2012).  The NJTCA provides a limited exception to the ninety-day requirement if the claimant can show, "within one year after the accrual of his claim," both "extraordinary circumstances," which prevented the timely filing of the notice, and that the defendant is not "substantially prejudiced" by a later filing.  N.J. Stat. Ann. § 59:8-9. A plaintiff is "forever barred from recovering against a public entity or public employee" if she fails to timely file a notice or if "[t]wo years have elapsed since the accrual of the claim."  N.J. Stat. Ann. § 59:8-8.

Nothing in the Complaint indicates whether Plaintiff filed a timely notice or was granted permission to file a late notice.  Therefore, Plaintiff has not sufficiently pled this Court's jurisdiction over her tort claims.  *See Alvarado v. Johnson*, No. 19-18574, 2020 WL 3819211, at *2 (D.N.J. July 8, 2020) (dismissing without prejudice plaintiff's tort claims because "the pleadings in the complaint do not indicate that [plaintiff] filed any such pre-suit notices required by the NJTCA").

16

Plaintiff argues in her opposition briefs that a notice of claim form was sent to the City on March 24, 2021 and that the Newark Police Division responded by a letter dated April 15, 2021 acknowledging receipt of the notice. (*See e.g.,* D.E. 55 at 22–23). In addition, Plaintiff also provides exhibits in her briefs to demonstrate her compliance with the NJTCA. (*Id.* Ex. A, Ex. B.) The Third Circuit, however, has made clear that in deciding a motion to dismiss, "a court must consider only the complaint" and "exhibits attached to the complaint." *Belichick*, 605 F.3d at 230. Therefore, the materials attached to Plaintiff's briefs cannot be considered and Counts XII to XIX are dismissed without prejudice.

Simpkins also argues that the tort claims against him should be dismissed on the grounds of "good faith" immunity under the NJTCA and the common law sudden emergency doctrine. These arguments are unpersuasive.

The NJTCA grants immunity to a public employee "if he acts in good faith in the execution or enforcement of any law." *Walker v. City of Newark*, No. 19-16853, 2020 WL 3542502, at *13 (D.N.J. June 30, 2020), *as amended* (July 1, 2020). Whether Simpkins acted in good faith cannot be determined at this time for the same reasons he is not entitled to qualified immunity. Questions of good faith arising under the NJTCA are also determined by the reasonableness standard. N.J.S.A. 59:3-3; *see Mantz v. Chain*, 239 F. Supp. 2d 486, 507–08 (D.N.J. 2002) (citing *Lear v. Twp. of Piscataway*, 566 A.2d 557 (N.J. Super. Ct. App. Div. 1989)). Because there are factual disputes material to the determination of good faith immunity, the Court cannot determine at the pleading stage whether the NJTCA shields Simpkins from liability for his use of force on Dorsey.

The sudden emergency doctrine applies when "a party [was] confronted by a sudden emergency over which he had no control, without fault on his part." *Roberts v. Hooper*, 438 A.2d 351, 353 (N.J. Super. Ct. App. Div. 1981). The doctrine "negates negligence if the jury finds that

the party chose one of alternative reasonably prudent courses of action, even though, by hindsight, another course of action would have been safer." *Id.* at 478–79. This doctrine is only applicable to negligence claims under New Jersey law and is therefore only applicable to Plaintiff's NIED claim, as that is the only negligence claim brought against Simpkins.

The standard for determining whether a defendant should not be liable because of a sudden emergency is reasonableness. *See Harpell v. Pub. Serv. Coordinated Transp.*, 120 A.2d 43, 47 (N.J. 1956) (holding that even when one "must make a speedy decision" in the face of an emergency, the "the conduct required is still that which is reasonable under the circumstances"). Therefore, even assuming, without deciding, that Simpkins' encounter with Dorsey was a sudden emergency, Simpkins may still be liable for negligence if his conduct was unreasonable. As stated previously, there remain material factual disputes surrounding the encounter to determine whether Simpkins acted reasonably. Therefore, Simpkins is not entitled to dismissal of Plaintiff's negligence claim under the sudden emergency doctrine at this time.

### C.  §1983 Failure to Intervene (Count IV)

The City and the Supervisory Defendants move to dismiss Plaintiff's claim for their failure to intervene. This claim will be dismissed without prejudice because Plaintiff fails to adequately allege that the City or the Supervisory Defendants had a reasonable opportunity to intervene.

A police officer can be held liable under § 1983 for failing to intervene to prevent a constitutional violation that occurs in his presence. *See Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.") (citation omitted). To state a claim for failure to intervene, a plaintiff must demonstrate that an officer (1) observed or had knowledge that a constitutional

violation was taking place, yet failed to intervene; and (2) had a reasonable and realistic opportunity to intervene.  *Id.* at 651.

Here, Plaintiff fails to show that the City or the Supervisory Defendants had a reasonable and realistic opportunity to intervene on January 1, 2021.  The Complaint does not plead that the City or Supervisory Defendants had prior knowledge that Simpkins or any of the officers at the scene were going to encounter Dorsey and use deadly force during the encounter.  In addition, the Complaint alleges no facts to show that any of the Supervisory Defendants was physically present at the scene or observed Simpkins' encounter with Dorsey.

The Third Circuit has instructively stated that "the duration of the incident is key to determining whether there was a reasonable opportunity" to intervene.  *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020).  "There may be a genuine issue of fact regarding a reasonable opportunity to intervene where the allegedly excessive force lasts about fifteen minutes or where the event unfolds in multiple stages.  By contrast, where an incident is momentary, its 'brevity' may 'defeat[ ] [a] . . . failure-to-intervene claim.'"  *Id.* at 335–36 (internal citations omitted) (alterations in original).  Here, Plaintiff does not dispute that the events that led to the violations of Dorsey's constitutional rights unfolded in no more than a couple of minutes.  The brevity of the incident makes it highly unlikely that either the City or any of the Supervisory Defendants could have reasonably and realistically intervened.[13]

Plaintiff argues that the City knew that Simpkins would violate Dorsey's constitutional rights based on Simpkins' history of civil rights violations.  Specifically, the Complaint refers to a 2009 state civil action filed by the ACLU against the NPD ("2009 lawsuit") alleging that

---

[13] It is possible Plaintiff's failure-to-intervene claim against Officers Doe 1-4 who were present at the scene might overcome the brevity of the incident, but this Court need not reach a conclusion on the claim's viability before facts pertaining to these officers' involvement are fully developed.

Simpkins held an African American football coach and two African American teenage football players at gun point during a traffic stop.  (D.E 1-5 at 60.)  While these allegations are deeply troubling, they do not plausibly show that the City or any of the Supervisory Defendants had a reasonable and realistic opportunity to intervene the fatal shooting of Dorsey.

Accordingly, the City and the Supervisory Defendants are entitled to dismissal of Plaintiff's claim for failure to intervene without prejudice.

**D.  §1983 Municipal Liability and Failure-to-Train-and-Supervise Claims (Counts V and VIII)**

The City and the Supervisory Defendants move to dismiss Plaintiff's municipal liability claims for unconstitutional policy or custom and for failure to train and supervise NPD officers. Because the Complaint fails to demonstrate that an unconstitutional policy or custom caused the violations of Dorsey's constitutional rights, Plaintiff's municipal liability claim is dismissed without prejudice.  In addition, Plaintiff has not sufficiently pled deliberate indifference and her claims for failure to train and supervise NPD officers are also dismissed without prejudice.

A § 1983 claim against a municipality may proceed in two ways.  *Est. of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019).  First, a municipality may be liable under § 1983 if a plaintiff identifies a policy or custom that was the "proximate cause" of his injuries by "demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation he alleges."  *Id.* at 798.  A policy exists "when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (internal quotation marks, citation, and alteration omitted).  A custom may be established "by showing that a given course of conduct,

although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citation omitted).

Second, a municipal liability claim may also be premised on a municipality's failure to properly train, supervise, or discipline its employees. *See Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("[I]n the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation . . . under § 1983."). To plead such a claim involving police misconduct, a plaintiff must demonstrate that a city's failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Roman*, 914 F.3d at 798 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A plaintiff sufficiently pleads deliberate indifference by showing that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (quoting *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011) (alterations omitted)).  In addition to deliberate indifference, "[t]he failure to train must have a causal nexus with [the plaintiff's] injury." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014) (citation and internal quotation marks omitted).

Similarly, "supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm[.]" *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (quotation and alteration marks omitted)).  Liability can also attach against supervisors "if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Id.*

Here, Plaintiff has not pled a municipal policy or custom of engaging in the specific kinds of constitutional violations alleged in the Complaint.  The Complaint does not allege that a municipal decisionmaker with "final authority" to make policy issued an "official proclamation, policy, or edict" about the use of excessive force or the practice of search or arrest without probable cause.  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990).  In addition, the Complaint lacks any factual allegations to support a plausible inference that a municipal policy can be affirmatively linked to Simpkins' use of excessive force on Dorsey.

Similarly, Plaintiff fails to adequately allege a custom, so "well-settled and permanent as virtually to constitute law," of permitting excessive force, illegal search and seizure, or other constitutional violations that proximately caused Dorsey's death.  *Bielevicz*, 915 F.2d at 850.  The Complaint also fails to allege that any of the Supervisory Defendants had any personal involvement in the violations of Dorsey's rights.

Plaintiff argues that the Complaint has sufficiently pled an unconstitutional custom and deliberate indifference to the lack of adequate training for NPD officers.  Plaintiff relies on several documents attached to the Complaint, including the 2009 lawsuit, a Consent Decree the City entered into with the Justice Department in 2016 ("Consent Decree") and subsequent monitor reports, to show that the City and the Supervisory Defendants had notice of an unconstitutional custom and that they were indifferent to inadequate training and supervision of NPD officers.  Plaintiff also cites *Roman* as "helpful guidance" as to the sufficiency of her claims.  (*See* D.E. 56 at 31.)  These arguments are unpersuasive and *Roman* is distinguishable from this case.

In *Roman*, the Third Circuit held that plaintiff Roman had sufficiently pled a *Monell* claim based on a custom of warrantless searches and a failure-to-train claim against the City of Newark.  *See Roman*, 914 F.3d at 798–99.  On the issue of unconstitutional custom, the Third Circuit found

that the documents cited by Roman, such as the Consent Decree, covered the same types of unconstitutional conduct as he alleged. *Id.* at 799. The Third Circuit also found that while the Consent Decree was not in place during Roman's search and arrest in May 2014, the investigation that resulted in the Consent Decree and federal supervision began in May 2011 and ended in July 2014, so the Court could "fairly infer that the problems that led to [the Consent Decree] were occurring during the time of [Roman's] allegations and for some time before that." *Id.*

The Third Circuit reached the same conclusion with respect to Roman's failure-to-train and failure-to-supervise claims. *See id.* The Court noted that the head of the police union was quoted in the newspaper stating that he was last trained in 1995 when he first joined the force. *Id.* at 799–800. The Consent Decree also indicated that NPD officers in general were not trained on "the requirements of [the] Fourth Amendment and related law." *Id.* at 800. These allegations, the Third Circuit concluded, were "enough to prove municipal liability because the City [knew] to a moral certainty that its officers would need to conduct searches" but had failed to provide training for constitutional policing under the Fourth Amendment since 1995. *Id.* (internal quotation marks and citation omitted) (alteration in original).

Here, the Complaint has not pled sufficient allegations to raise a plausible custom claim to survive a motion to dismiss. First, Dorsey's claim arose in January 2021, almost seven years after the federal investigation into the NPD ended and almost five years after the City entered into the Consent Decree. (D.E. 1 ¶¶ 110–11.) There is no similar temporal proximity between the alleged unconstitutional police conduct and the Consent Decree for this Court to "fairly infer" that the problems covered in the Consent Decree had continued and proximately caused the violations of Dorsey's rights. Second, the Complaint makes no reference to any civilian complaint about the same constitutional violations alleged by Plaintiff other than a reference to the 2009 lawsuit

alleging that Simpkins held three African American civilians, two of them teenagers, at gun point during a traffic stop.  (D.E 1-5 at 60.)  These allegations alone do not plausibly show a custom of unconstitutional policing.

As for the failure-to-train and failure-to-supervise claims, the Complaint does not adequately allege the manner in which the training or supervision of police officers was inadequate.  The only non-conclusory factual allegations made in the Complaint are that: the Consent Decree required NPD to implement "comprehensive and interdisciplinary training"; the NPD was in "non-compliance with several provisions of the Consent Decree including . . . Stop, Searches, and Arrests"; the NPD "had not fully implemented" requirements for civilian review of use of force; and that the NPD had not implement a system "to effectively supervise NPD officers." (D.E. 1 ¶¶ 113–118).

These general allegations of non-compliance do not support a plausible inference that the City or the Supervisory Defendants knew to a moral certainty that NPD officers have been inadequately trained in policing under the Fourth Amendment and that a pattern of unconstitutional police conduct has developed as a result.  *See Adams v. City of Atl. City*, 294 F. Supp. 3d 283, 304 (D.N.J. 2018) ("'[A] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train'") (quoting *Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014)).

Accordingly, Plaintiff's municipal liability, failure-to-train, and failure-to-supervise claims against the City and the Supervisory Defendants will be dismissed without prejudice.

### E.  Equal Protection (Count VI)

Defendants seek to dismiss Plaintiff's equal protection claim for failure to state a claim. Plaintiff's equal protection claim will be dismissed without prejudice as the Complaint fails to

allege discriminatory intent and that Defendants treated Dorsey and "similarly situated" persons differently based on race.

To state a § 1983 equal protection claim a plaintiff must allege that (1) she is a member of a protected class and (2) she received different treatment than that received by other similarly situated individuals. *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992). In addition, race is one of the constitutionally protected classes. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985) (discussing protected classes). "Persons are similarly situated for purposes of an equal protection claim when they are alike 'in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Further, a plaintiff must allege "intentional discrimination." *Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015), *as amended* (Feb. 2, 2016).

While Plaintiff has met the first element, she has not sufficiently alleged that Defendants treated similarly situated persons outside of Dorsey's protected class differently. The Complaint has not identified who other "similarly situated" persons are or what unequal treatment those similarly situated individuals received from Defendants. *See Phillips*, 515 F.3d at 244 ("[A]n allegation of an equal protection violation still must contain a claim that a plaintiff has been treated differently from others who are similarly situated."). Moreover, Plaintiff has not sufficiently set forth discriminatory intent on the part of any of the Defendants. The Third Circuit has declared that discriminatory intent requires that the decision-maker took "a particular course of action at least in part '*because of*,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) (emphasis added) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, (1979)). The Complaint and its voluminous exhibits

fail to sufficiently allege that Simpkins or any other NPD officers or supervisors subjected Dorsey to disparate treatment because of his race.

Accordingly, Plaintiff's equal protection claim is dismissed without prejudice.

### F. Safe Streets Act & Title VI (Counts IX and X)

The City moves to dismiss Plaintiff's claims for racial discrimination under Title VI and the anti-discrimination provision of the Safe Streets Act. For the same reasons stated above, the Complaint has not sufficiently pled a claim for racial discrimination under either statute.

The Safe Streets Act "prohibits discrimination in the allocation of benefits, participation, and employment by any program funded by certain Department of Justice grants authorized by the Act." *Suber-Aponte v. Borough of Pottstown*, No. 15-1314, 2016 WL 5341299, at *3 (E.D. Pa. Sept. 23, 2016). Although Plaintiff has identified NPD programs funded by the Safe Streets Act in Exhibit B to the Complaint, (D.E. 1-3 at 2–14), she fails to identify a "program or activity" under which Dorsey was subjected to discrimination, nor does she allege facts showing a nexus between the expenditure of federal funds and any alleged discrimination. Thus, the Complaint fails to state a claim under the Safe Streets Act. *See United States. v. City of Philadelphia*, 644 F.3d 187, 205–06 (3d Cir. 1980).

Similarly, "Title VI prohibits intentional discrimination based on race in any program that receives federal funding." *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 179 (3d Cir. 2016) (first citing 42 U.S.C. § 2000d; and then citing *Alexander v. Sandoval*, 532 U.S. 275, 282–83 (2001)). As such, "[t]he two elements for establishing a cause of action pursuant to Title VI are (1) that there is racial or national origin discrimination and (2) the entity engaging in discrimination is receiving federal financial assistance." *Pocono Mountain Charter Sch. v. Pocono*

*Mountain Sch. Dist.*, 908 F. Supp. 2d 597, 615 (M.D. Pa. 2012).  The Complaint has failed to meet the first element.

Therefore, Plaintiff's claims under the Safe Streets Act and Title VI are dismissed without prejudice for failure to state a claim.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motions are **GRANTED in part and DENIED in part** as set forth below:

1. Counts I to III (excessive force, illegal seizure, and illegal search) against Simpkins are permitted to proceed.

2. Count IV (failure to intervene) against the City and the Supervisory Defendants is dismissed without prejudice.

3. Count V (*Monell* and supervisory liability) against the City and the Supervisory Defendants is dismissed without prejudice.

4. Count VI (equal protection) against all Defendants is dismissed without prejudice.

5. Count VII (failure to provide medical aid) against Simpkins is permitted to proceed.

6. Count VIII (failure to adequately train and supervise) against the City and the Supervisory Defendants is dismissed without prejudice.

7. Counts IX and X (violations of the Safe Streets Act and Title VI) against the City are dismissed without prejudice.

8. Count XI (NJCRA claims) against Simpkins is permitted to proceed, but to the extent Plaintiff brings Count XI against the City and the Supervisory Defendants, it is dismissed without prejudice.

9.  Counts XII to XIX (common law tort claims) against all Defendants are dismissed

without prejudice.

Plaintiff shall have thirty (30) days to file an amended complaint.  An appropriate order

follows.


_____/s/ Susan D. Wigenton_____
**SUSAN D. WIGENTON, U.S.D.J.**


Orig:        Clerk
cc:           Michael A. Hammer, U.S.M.J.
              Parties

28